Cameron N Verdi
220 Newport Center Drive #11-122
Newport Beach, Ca 92660
Telephone (949) 887 - 0492
Facsimile: (949) 625 -7850
cameronverdi@gmail.com

*Appearing in Propria persona*

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| CAMERON N. VERDI, an individual,<br><br>        Plaintiff,<br><br>    vs.<br><br>SIGNATURE BANK, a New York corporation; JOSEPH DEPAOLO, an individual; STEPHEN WYREMSKI, an individual; ERIC HOWELL, an individual; and DOES 1 through 10, inclusive,<br><br>        Defendants. | Case No.: 1:24-cv-00791-DEH-RFT<br><br>**PLAINTIFF CAMERON N. VERDI'S OPPOSITION TO MOTION TO DISMISS**<br><br>**[DOC. 36]** |

**TABLE OF CONTENTS**

I.     INTRODUCTION ……...…………….……………………….……1

II.    PRUDENTIAL STANDING ………...……………………….....4

      A. GENERALIZED GRIEVANCE…………………….…5

         *1.* First Cause of Action: Fraudulent Concealment….…6

         *2.* Second Cause of Action: Constructive Fraud….……7

         *3.* Sixth Cause of Action: Aiding and Abetting Breach of Fiduciary Duty………………………………..….…8

      B. ZONE OF INTERESTS…………………………...….9

      C. THE FAILED THIRD-PARTY STANDING ARGUMENT…………..…………………………………11

III.   DEFICIENCIES IN THE FDIC-R'S ARGUMENT ON THE SUCCESSION CLAUSE………………………………………..17

      A. THE TEXT OF THE SUCCESSION CLAUSE DOES NOT SUPPORT THE FDIC-R'S INTERPRETATION…………...17

      B. JUDICIARY HAS NOT AFFIRMED SUCCESSION CLAUSE'S APPLICAPIBILITY TO DIRECT FRAUD CLAIMS…………………………………………………...20

      C. INSURANCE FUNDS ARE NOT AN ASSET OF THE BANK…………………………………………………...21

      D. FIRREA'S INTENT AND HISTORICAL CONTEXT CONTRADICT THE FDIC'S READING…………………...22

      E. REEVALUATING THE FDIC-R'S MISGUIDED DEPENDENCE ON 'ZUCKER' PRECEDENT…………….23

IV.    CONCLUSION……………………….……………....…….…..…25

# TABLE OF AUTHORITIES

**CASES**                                                                 **Page(s)**

*Aaron v. Illinois Nat'l Ins. Co.,*
2023 WL 7389034, at *3 (E.D. La. Nov. 8, 2023)……………………20, 21

*Abrahamson v. W. Sav. & Loan Ass'n,*
1994 WL 374294…………………………………………………………..…17

*Allen v. Wright,*
468 U.S. 737, 751 (1984)………………………………………..……..4, 5

*Am. Nat. Ins. Co. v. F.D.I.C.,*
642 F.3d 1137, 1142 (D.C. Cir. 2011)…………………………………..13

*America West Bank Members v. Utah,*
2023 WL 4108352 (D. Utah June 21, 2023)………………………………25

*Ashcroft v. Iqbal,*
556 U.S. 662, 678 (2009)………………………………….…………….6

*Ass'n of Battery Recyclers v. EPA,*
716 F.3d 667, 678 (D.C. Cir. 2013)………………………….………4, 10

*Barnes v. Harris,*
783 F.3d 1185, 1193 (10th Cir. 2015)…………………………..………14

*Barrows,*
346 U.S. 249…………………………………………………………..12

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544, 570 (2007)………………………………………………6

*Bennett v. Spear,*
520 U.S. 154, 162 (1997)………………………………………………4, 9

*Chandler & Newville v. Quality Loan Serv. Corp.,*
2014 U.S. Dist. LEXIS 76179, 11–12 (D. Or. Apr. 18, 2014)……………..11

*City of Erie v. Pap's A.M.,*
529 U.S. 277, 305–06 (2000)……………………………………………..5

*Clarke v. Sec. Indus. Ass'n,*
479 U.S. 388, 400 n.16 (1987)…………………………………...…..9

*Cohens v. Virginia,*
19 U.S. 264 (1821)………………………………………………..3

*Colo. River Water Conservation Dist. v. United States,*
424 U.S. 800, 820 (1976)…………………………………………4, 5

*Commodity Futures Trading Comm'n v. Schor,*
478 U.S. 833, 850 (1986)……………………………..………………..3

*Cooper v. Pickett,*
137 F.3d 616, 625 (9th Cir. 1997)…………………………………...7, 8

*Data Processing,*
397 U.S. at 153……………………………………………9, 10, 11

*Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.),*
42 F.3d 1541, 1548 (9th Cir. 1994)…………………………...……..7

*Eberhard v. Marcu,*
530 F.3d 122, 136 n.14 (2d Cir. 2008)…………………………………..19

*Elk Grove Unified Sch. Dist. v. Newdow,*
542 U.S. 1, 12 (2004)……………………………………….……4, 5

*Esther Sadowsky Testamentary Tr. v. Syron,*
2009 WL 10697000, at *2-3 (S.D.N.Y. Jan. 28, 2009)……………………20

*Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.,*
902 F. Supp. 2d 476, 501 (S.D.N.Y. 2012)………………………...……13

*FDIC v. Jenkins,*
888 F.2d 1537, 1546 (11th Cir. 1989)…………………………………...21

*Franchise Tax Bd. v. Alcan Aluminum,*
493 U.S. 331, 336–37 (1990)……………………………………….....12

*Gladstone Realtors v. Vill. of Bellwood,*
441 U.S. 91, 119 (1979)……………………………………….……….4

*Hayes v. Gross*,
982 F.2d 104, 109-10 (3d Cir. 1992)……………………………..…17

*Henderson,*
131 S. Ct. at 1202–03………………………………….………….10

*Howard v. Haddad,*
916 F.2d 167, 169-70 (4th Cir. 1990)………………….15, 16, 18, 21, 22, 24

*IIT v. Cornfeld,*
619 F.2d 909, 922 (2d Cir.1980)……………………………………….9

*In re Beach First Nat'l Bancshares, Inc.,*
702 F.3d 772, 780 (4th Cir. 2012)…………………………………….20

*In re Smith Barney Transfer Agent Litig.,*
765 F. Supp. 2d 391, 398 (S.D.N.Y. 2011)………………………...18

*In re Sunrise Sec. Litig.,*
916 F.2d 874, 889 (3d Cir. 1990)………………………………….14, 20

*Kamen v. Kemper Fin. Servs., Inc.,*
500 U.S. 90, 95 (1991)……………………………………………..18

*Kane v. Johns-Manville Corp.,*
843 F.2d 636, 644 (2d Cir. 1988)…………………………….……11

*Levin v Kitsis,*
82 AD3d 1051, 1054 [2011]……………………………………...7

*Levin v. Miller,*
763 F.3d 667, 672 (7th Cir. 2014)………..……...13, 14, 15, 18, 19, 21

*Lexmark,*
134 S. Ct. at 1387……………………………………..…….9, 10, 11, 12

*Lubin v. Skow,*
382 F. App'x 866, 870-71 (11th Cir. 2010)……………………………14, 20

*Lujan,*
504 U.S. at 559……………………………………………...…….5

*Mandarin Trading Ltd. v. Wildenstein,*
16 N.Y.3d 173, 178 (2011)…………………………………………7

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
132 S. Ct. 2199, 2210 (2012)…………………………………………..9

*Mobil Oil Corp. v. Joshi,*
202 A.D.2d 318 (1st Dept. 1994)……………………………………7

*Moore v. Kayport Package Express, Inc.,*
885 F.2d 531, 540 (9th Cir. 1989)…………………………...…………8

*Morrone ex rel. Arotech Corp. v. Erlich,*
2011 WL 1322085, at *5 (E.D.N.Y. Mar. 31, 2011)………………………15

*N.Pipeline Constr. Co. v. Marathon Pipe Line Co.,*
458 U.S. 50, 58–59 (1982)………………………………..…………3

*Ortiz v. Comm'r of Soc. Sec.,*
659 F. Supp. 3d 301, 306 (E.D.N.Y. 2023)………………………...17

*Pareto v. FDIC,*
139 F.3d 696 (9th Cir. 1998) ...............................................15, 20

*Patel v. Patel,*
2010 WL 11549879, at *2 (N.D. Ga. Dec. 29, 2010)……………………18

*Phillips Petroleum Co. v. Shutts,*
472 U.S. 797 (1985)…………………………………………..12

*Preiser v. Newkirk,*
422 U.S. 395, 401 (1975)……………………………………………………………5

*P. T. Bank Cent. Asia v. ABN AMRO Bank N.V.,*
301 A.D.2d 373, 376 (1st Dept. 2003)……………………………………………7

*R. Power Biofuel, LLC v. Chemex LLC,*
2016 U.S. Dist. LEXIS 154727, *34 (N.D. Cal. Nov. 11, 2016)……....…….8

*Raines,*
362 U.S. at 22…………………………………………………………………12

*Rajamin v. Deutsche Bank Nat'l Tr. Co.,*
757 F.3d 79, 86 (2d Cir. 2014)………………………………………………..19

*Richardson v. Ramirez,*
418 U.S. 24, 36 (1974)………………………………………………………5

*Samuel M. Feinberg Testamentary Trust v. Carter,*
652 F.Supp. 1066, 1082 (S.D.N.Y.1987)……………………………………9

*Sears v First Pioneer Farm Credit,*
ACA, 46 AD3d 1282, 1286 [2007]…………………………………………7

*Semegen v. Weidner,*
780 F.2d 727, 731 (9th Cir. 1985)……………………………………..8

*Smith Barney,*
765 F. Supp. 2d at 398……………………………………………19, 21

*Syron,*
2009 WL 10697000…………………………………………………...20

*United Food & Commercial Workers Union Local 751 v. Brown Grp.,*
517 U.S. 544, 557–58 (1996)………………………………………………12

*U.S. Dep't of Labor v. Triplett,*
494 U.S. 715, 737 n.3 (1990)………………………………………………12

*Vess v. Ciba-Geigy Corp. USA,*
317 F.3d 1097, 1106 (9th Cir. 2003)……………………...………………7

*Warth,*
422 U.S. at 500–01……………………………………………5, 11, 12

*Yudell v. Gilbert,*
99 A.D.3d 108, 108 (1st Dep't 2012)………………………………………15

*Zucker v. Rodriguez,*
919 F.3d 649 (1st Cir. 2019) ..............................14, 15, 17, 21, 22, 23, 24, 25

**STATUTES**

12 U.S.C. § 1819……….……………………………………………………...1

12 U.S.C. § 1821(d)…………………………………….……2, 13, 14, 17, 18

15 U.S.C. § 1125 (a)……………………….…………..………………..…10

**RULES**

Federal Rule Civil Procedure 9(b)…………..………………………7, 8

Federal Rule Civil Procedure 12(b)(6)……………………….……2, 6, 25

**OTHER AUTHORITIES**

135 Cong. Rec. H4985 (daily ed. Aug. 3, 1989)...........................................22

135 Cong. Rec. S3993-01 (April 17, 1989) ................................................22

Financial Institutions Reform, Recovery,
and Enforcement Act of 1989……………………………..……………......1

Private Securities Litigation Reform Act of 1995…………………………19

**OTHER**

David N. Cassuto, *The Law of Words: Standing, Environment, and Other Contested Terms,* 28 HARV. ENVTL. L. REV. 79, 88 (2004)…………..…5

Gary Lawson, *Controlling Precedent: Congressional Regulation of Judicial Decision-Making,* 18 CONST. COMMENT. 191, 218 (2001)…………...…4

Jeffrey Kahn, *Zoya's Standing Problem, or, When Should the Constitution Follow the Flag?,* 108 MICH. L. REV. 673, 676 (2010)……………………5

Jim Wedeking, *Addressing Judicial Resistance to Reciprocal Reliance Standing in Administrative Challenges to Environmental Regulations,* 14 N.Y.U. ENVTL. L.J. 535, 544 (2006)……………………………………....4

Plaintiff Cameron N. Verdi (hereinafter "Plaintiff") submits this Memorandum of Points and Authorities in opposition to the Motion to Dismiss (hereinafter "Mot." or "Motion") filed by the Federal Deposit Insurance Corporation (hereinafter "FDIC") in its capacity as the Receiver (hereinafter "FDIC-R") for Signature Bank (hereinafter "Signature").

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

For the reasons detailed herein, the arguments presented by the FDIC-R are both misplaced and rooted in an overreaching interpretation of the authority granted by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (hereinafter "FIRREA"), as amended, codified at 12 U.S.C. § 1819 et seq.

The FDIC-R proposes that, *"Plaintiff's claims depend entirely on his status as a Bank stockholder, and, as demonstrated below, they concern the Bank and the Bank's assets. The claims therefore belong to the FDIC-R, not Plaintiff, under the Succession Clause. As a result, Plaintiff lacks prudential standing because he asserts claims that he does not own."* [Mot. at 1.] [1]

This proposition is demonstrably wrong, and the Court should reject the FDIC-R's attempt to usurp Plaintiff's ability to recover for the damages that he suffered.

The FDIC-R's *Motion* prematurely raises fact questions requiring discovery, including which direct claims are rightfully asserted against which defendants.

As explained infra, the FDIC-R's arguments rely on sweeping misinterpretations of FIRREA that contravene its text, structure, purpose, and history. Congress did not intend FIRREA to thwart fraud suits and, to the contrary, crafted FIRREA to ensure private investors could continue to pursue them against failed banks' officers, directors, and auditors—precisely what is happening here.

---

[1] The FDIC-R, by its tacit acquiescence to the Plaintiff's settlement with the Individual Defendants, has conceded its non-ownership of the Plaintiff's claims. Knowledge of, and failure to object to, the Plaintiff's tentative accord unmistakably signals the FDIC-R's recognition of the Plaintiff's autonomous legal footing in these proceedings. [Mot. at 1, fn. 1.]

Plaintiff's claims do not belong to the FDIC-R under FIRREA Section 1821(d)(2)(A)(i) (the "Succession Clause") because that provision only applies to *derivative* claims asserted *on a failed bank's behalf*, not to the *direct investor* claims asserted here. The FDIC-R's claim that the Succession Clause gives it ownership of direct investor claims has been rejected by every court to hear it—indeed, the FDIC-R relies entirely on inapposite, outlier authority that did *not involve securities fraud claims.* A near-uniform body of case law and FIRREA's history make clear that Congress did not intend the FDIC-R to gain ownership of securities fraud claims possessed by investors individually defrauded by directors, officers, and agents of the failed bank.

The FDIC-R's *Motion* should be denied because:

(1) the *Motion* does not meet the requirements for dismissal as codified under Fed. R. Civ. P. 12(b)(6);

(2) the factual and legal backdrop before the Court does not support a determination the Plaintiff lacks prudential standing;

(3) the Plaintiff asserted claims seeking recovery from the executive officer defendants in their individual capacities without recourse to the assets of Signature;

(4) the Plaintiff asserted claims seeking recovery from unnamed defendants, referred to as Does 1 through 10, until such time as discovery reveals their true identities and roles. These claims are pursued independently of any recourse to the assets of Signature [2];

(5) insurance funds, if any exist, are not an asset of the bank; and

(6) the Plaintiff's claims do not "relate to or concern the *assets of the Bank*" under the Succession Clause.

---

[2] The Plaintiff intends to seek leave to amend the complaint in order to accurately identify the true names and capacities of the Defendants upon determination. Imminent action is being prepared to request such relief, with the specific aim of adding KPMG International Limited, the auditors of Signature, as Defendants.

Once jurisdiction is clear, courts have a "virtually unflagging obligation" to hear and determine the case or controversy before them. [3] This "heavy obligation" [4] stems from the courts' roles both in checking the other branches and providing litigants with an impartial forum to petition for redress of their injuries. [5] Thus, as the Court noted in *Cohens v. Virginia*, [6] federal courts "have no more right to decline the exercise of jurisdiction which is given than to usurp that which is not given. The one or the other would-be treason to the Constitution." [7]

The Plaintiff asserts ownership of his claims, as detailed infra, and seeks to exercise this legal right under the subject matter jurisdiction of this Court.

While the FDIC may have succeeded to any *derivative* claims that could be brought by or on behalf of Signature, the law is clear that it cannot (and did not) take over the claims at issue here. This case involves *direct* fraud claims brought by Plaintiff to recover damages that he suffered. **Not** all the "Plaintiff's claims" against the Defendants pertain to acts that allegedly devalued Signature's assets. [Mot. at 4-5.]

Some claims focus on the devaluation of these assets, while others address acts that artificially inflated stock prices caused by the misrepresentations of the Individual Defendants and DOES 1 through 10. [Complaint, Doc. 1, ¶¶ 55-56, 73, 102, 104-105, 147, 165.]

Plaintiff asserts no claim derivatively on behalf of Signature or the FDIC. Furthermore, it is a truth universally acknowledged—or should be—that the judiciary has never found that the FDIC-R assumes ownership of investors' direct allegations of

---

[3] *Colo. River*, 424 U.S. at 817

[4] *Ibid.* at 820

[5] E.g., *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850 (1986); *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 58–59 (1982)

[6] *Cohens v. Virginia*, 19 U.S. 264 (1821)

[7] *Ibid.* at 404

fraud against erstwhile executives or auditors of a failed bank, if such claim does not relate "with respect to the [bank] and the assets of the [bank]". The very suggestion flirts with legal fiction.

## II.   PRUDENTIAL STANDING

The crux of the FDIC-R's Motion is the assertion that the Plaintiff lacks prudential standing for all claims. [Mot. at 5.] The FDIC-R is mistaken.

Prudential standing— "prudential rules of self-restraint" that bar standing to those "ill-suited to litigate the claims they assert" [8]—lies at the heart of a "confusing tangle of jurisprudential concepts." [9] Although "not exhaustively defined," [10] the doctrine has incorporated three core principles: (i) generalized grievances; (ii) the zone of interests; and (iii) third-party standing. [11] It is treated as distinct from constitutional standing, which, at a minimum, requires the plaintiff to "demonstrate that he has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." [12] The Plaintiff meets both prudential and constitutional requirements.

Prudential standing doctrine has been called "a twentieth-century invention of highly dubious character" [13] and, like standing generally, "amorphous." [14] Its expansion and application in discrete cases has been characterized as "confused, confusing, and

---

[8] *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 119 (1979)

[9] *Ass'n of Battery Recyclers v. EPA*, 716 F.3d 667, 678 (D.C. Cir. 2013) (Silberman, J., concurring)

[10] *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004)

[11] *Allen v. Wright*, 468 U.S. 737, 751 (1984)

[12] *Bennett v. Spear*, 520 U.S. 154, 162 (1997)

[13] Gary Lawson, *Controlling Precedent: Congressional Regulation of Judicial Decision-Making*, 18 CONST. COMMENT. 191, 218 (2001)

[14] Jim Wedeking, *Addressing Judicial Resistance to Reciprocal Reliance Standing in Administrative Challenges to Environmental Regulations*, 14 N.Y.U. ENVTL. L.J. 535, 544 (2006)

potentially detrimental;"[15] "inconsistent with any coherent constitutional philosophy;"[16] and a tool for avoiding consideration of the merits.[17]

## A. GENERALIZED GRIEVANCE

First, exercising the judicial role is limited to [18]— and an obligation of [19]—the court's jurisdiction. The court's jurisdiction—its power—is limited to cases or controversies.[20] Standing doctrine, like other justiciability concepts, relies upon an understanding of what a case or controversy is; in this case, by identifying the qualities that the litigant must possess.[21] Yet it also speaks to what the judicial power is not; specifically, by reference to the broader role of the courts in a democratic society.[22] These are distinct but overlapping concepts that are grounded in the Constitution.

The generalized grievances principle, for example, spoke to the role of the courts in our system of governance. It respected individuals' right to petition the government for redress, but it limited access to the courts to those whose grievances were properly steered to the Judiciary as opposed to Congress or the Executive. Such a rule was viewed as prudent because it went to the core of standing inquiry: Is this litigant properly invoking the court's jurisdiction?[23]

---

[15] David N. Cassuto, *The Law of Words: Standing, Environment, and Other Contested Terms*, 28 HARV. ENVTL. L. REV. 79, 88 (2004)

[16] Jeffrey Kahn, Zoya's Standing Problem, or, When Should the Constitution Follow the Flag?, 108 MICH. L. REV. 673, 676 (2010)

[17] *Elk Grove*, 542 U.S. at 18 (Rehnquist, J., concurring).

[18] *Richardson v. Ramirez*, 418 U.S. 24, 36 (1974), *City of Erie v. Pap's A.M.*, 529 U.S. 277, 305–06 (2000) (Scalia, J., concurring) (quoting Preiser v. Newkirk, 422 U.S. 395, 401 (1975))

[19] *See, e.g., Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 820 (1976)

[20] *See, e.g., Lujan*, 504 U.S. at 559

[21] *See Ibid.* at 560

[22] *Allen*, 468 U.S. at 750

[23] *See Warth*, 422 U.S. at 500–01

1
2
3
4
5
6

Evident from Plaintiff's Complaint (hereinafter "Complaint"), all three causes of action against Signature are based on state law. [Doc. 1.] [24] In the Complaint, Plaintiff asserts claims for (1) fraudulent concealment, (2) constructive fraud, and (3) aiding and abetting breach of fiduciary duty as to all Defendants, and breach of fiduciary duty, conspiracy to defraud, and breach of duty of loyalty as to the Individual Defendants. [Ibid.]

7
8
9
10
11

A plaintiff must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility" if the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

12
13
14
15
16
17
18

In resolving a Fed. R. Civ. P. 12(b)(6) motion under *Twombly*, the Court must follow a two-pronged approach. First, the Court must accept all well-pleaded factual allegations as true, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Nor must the Court "'accept as true a legal conclusion couched as a factual allegation.'" [Ibid.] at 678-80 (quoting *Twombly*, 550 U.S. at 555). Second, assuming the veracity of well-pleaded factual allegations, the Court must "determine whether they plausibly give rise to an entitlement to relief." [Ibid. at 679.]

19
20
21
22

This determination is context-specific, requiring the Court to draw on its experience and common sense, but there is no plausibility "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." [Ibid.]

23

**1.     First Cause of Action: Fraudulent Concealment**

24
25
26

In order to state a claim for fraudulent concealment under New York law, a plaintiff must allege that the defendant made a material misrepresentation of fact, that

27
28

---

[24] Signature's co-defendants have not joined in the FDIC-R's *Motion to Dismiss*.

the misrepresentation was made intentionally in order to defraud or mislead the plaintiff, that the plaintiff reasonably relied on the misrepresentation, and that the plaintiff suffered damage as a result of its reliance on the defendant's misrepresentation. *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 178 (2011).

In addition to the foregoing elements, a plaintiff must allege that the defendant had a duty to disclose material information and that it failed to do so. *P. T. Bank Cent. Asia v. ABN AMRO Bank N.V.*, 301 A.D.2d 373, 376 (1st Dept. 2003); *Mobil Oil Corp. v. Joshi*, 202 A.D.2d 318 (1st Dept. 1994). And, with all complaints alleging fraud, the plaintiff must plead the claim with particularity. CPLR § 3016(b).

Referencing Plaintiff's Complaint [Doc. 1.], the Court is directed to ¶¶ 28 – 34, 40, 51, 53, 54, 55, 90, 143, 145, 149, 178, 179, 180. Plaintiff contends the factual allegations in the Complaint are sufficient to state a claim for fraudulent concealment under the standard outlined supra, giving rise to an entitlement to relief.

## 2.     Second Cause of Action: Constructive Fraud

In order to state a claim for constructive fraud under New York law, the elements of a cause of action to recover for constructive fraud are the same as those to recover for actual fraud with the crucial exception that the element of scienter . . . is dropped and is replaced by a requirement . . . [to] prove the existence of a fiduciary or confidential relationship warranting the trusting party to repose his or her confidence in [a] defendant and therefore to relax the care and vigilance he or she would ordinarily exercise in the circumstances" *Levin v Kitsis*, 82 AD3d 1051, 1054 [2011] [internal quotation marks, brackets, ellipsis and citations omitted]; *see Sears v First Pioneer Farm Credit, ACA*, 46 AD3d 1282, 1286 [2007].

Under Federal Rule of Civil Procedure 9(b), a plaintiff must plead each element of a fraud claim with particularity, i.e., the plaintiff "must set forth more than the neutral facts necessary to identify the transaction." *Cooper v. Pickett*, 137 F.3d 616, 625 (9th Cir. 1997) (emphasis in original) (quoting *Decker v. GlenFed, Inc.* (*In re GlenFed, Inc. Sec. Litig.*), 42 F.3d 1541, 1548 (9th Cir. 1994)). A fraud claim must be accompanied by "the who, what, when, where, and how" of the fraudulent conduct charged. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting

*Cooper*, 137 F.3d at 627). "A pleading is sufficient under rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations." *Moore v. Kayport Package Express, Inc*., 885 F.2d 531, 540 (9th Cir. 1989). Statements of the time, place, and nature of the alleged fraudulent activities are sufficient, but mere conclusory allegations of fraud are not. [Ibid.] Furthermore, though allegations based on information and belief are usually insufficient, in circumstances of corporate fraud, this rule may be relaxed as to matters within the opposing party's knowledge. [Ibid.]

However, Rule 9(b) provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Accordingly, the heightened standard "does not apply to allegations regarding the defendant's state of mind. Thus, knowledge and intent need only be alleged generally to state a valid claim." *R. Power Biofuel, LLC v. Chemex LLC*, 2016 U.S. Dist. LEXIS 154727, *34 (N.D. Cal. Nov. 11, 2016) (citing Fed. R. Civ. P. 9(b).)

Referencing Plaintiff's Complaint [Doc. 1.], the Court is directed to ¶¶ 28 – 34, 40, 51, 53, 54, 55, 90, 125, 126, 143, 145, 147, 149, 178, 179, 180, 182, 198, 199. Plaintiff contends the factual allegations in the Complaint are sufficient to state a claim for constructive fraud under the standard outlined supra, giving rise to an entitlement to relief. These allegations are sufficiently specific to give Defendants notice of the "particular misconduct alleged" and the ability to defend itself against the specific charges. See *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).

### 3.   Sixth Cause of Action: Aiding and Abetting Breach of Fiduciary Duty

Under New York law, a plaintiff seeking to establish a cause of action for aiding and abetting a breach of fiduciary duty must show: "(1) the existence of a ... violation by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary

violation." *Samuel M. Feinberg Testamentary Trust v. Carter,* 652 F.Supp. 1066, 1082 (S.D.N.Y.1987) (quoting *IIT v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980)).

Referencing Plaintiff's Complaint [Doc. 1.], the Court is directed to ¶¶ 32, 33, 34, 58, 67, 68, 90, 113, 124, 125, 143, 145, 167, 179, 198. Plaintiff contends the factual allegations in the Complaint are sufficient to state a claim for aiding and abetting breach of fiduciary duty under the standard outlined above, giving rise to an entitlement to relief.

## B. ZONE OF INTERESTS

As noted, the zone of interests principle quickly followed the generalized grievances principle as one of the core components of prudential standing. Justice Powell's concurrence in *Richardson* characterized the principle as "undoubtedly" [25] part of prudential standing, and the Court accepted this classification for nearly four decades. [26] Under this test, the court looks to "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." [27]

Defining the scope of protected interests under this test has historically hinged upon the statute or constitutional right in question, with the "generous" review provisions of the Administrative Procedure Act ("APA") warranting broader prudential standing than questions involving other statutory or constitutional interests. [28]

In *Lexmark*, however, the Court unanimously concluded that the zone of interests test does *not* speak to standing. [29]

---

[25] *Richardson*, 418 U.S. at 197

[26] *See, e.g., Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (characterizing the test as prudential).

[27] *Data Processing*, 397 U.S. at 153

[28] *Bennett*, 520 U.S. at 163; *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 400 n.16 (1987)

[29] *Lexmark*, 134 S. Ct. at 1387

1
2
3

Lexmark sued Static Control, alleging violations of the Copyright Act of 1976 and the Digital Millennium Copyright Act. Static Control countersued, alleging that Lexmark was guilty of false advertising under 15 U.S.C. § 1125(a) ("the Lanham Act").

4
5
6
7
8

After the district court concluded that Static Control lacked prudential standing to bring the Lanham Act claim, the Sixth Circuit Court of Appeals reversed. [30] The Supreme Court granted certiorari to address "the appropriate analytical framework for determining a party's standing to maintain an action for false advertising under the Lanham Act. [31]

9
10
11
12

At the outset, the Court questioned federal courts' authority to "decline to adjudicate" cases within their jurisdiction for prudential reasons. Moreover, the Court concluded that *Data Processing* "rested on statutory, not 'prudential,' considerations." [32]

13
14
15
16

Although the Court acknowledged that it treated the test as part of prudential standing in the past, the Court concluded that the test "does not belong there." [33] Quoting Judge Silberman, the Court explained "'prudential standing' is a misnomer" as applied to the zone-of-interests analysis, which asks whether "this particular class of persons ha[s] a right to sue under this substantive statute." [34]

17
18
19
20

*Lexmark* thus establishes that the zone of interests principle only speaks to whether the litigant has a cause of action under the statute—a question that is not jurisdictional. [35] If the principle goes to the statutory cause of action, the court does not

21

22

[30] *Ibid.* at 1385

23

[31] *Ibid.*

24

[32] *Lexmark*, 134 S. Ct. at 1386

25

[33] *Ibid*. at 1387

26

27

[34] *Ibid.* (quoting *Battery Recyclers*, 716 F.3d at 675–76 (Silberman, J., concurring)).

28

[35] *Lexmark*, 134 S. Ct. at 1388 n.4. This conclusion reflects the Roberts Court's ongoing effort to "bring some discipline" to the use of the term "jurisdictional," which it has limited to questions concerning the court's subject-matter or personal jurisdiction. *Henderson*, 131 S. Ct. at 1202–03.

have the authority to substitute its policy judgment concerning that right for Congress. [36]

In sum, *Lexmark* returns the zone of interests inquiry to its origins. [37] After *Richardson* [38] and prior to *Lexmark*, it served as a standalone prudential limitation on standing. After *Lexmark*, it should be considered little more than one component of the presumptive limits of a statutory cause of action. [39] In the process, however, the Court also demonstrated that one of the underlying purposes of recognizing the zone of interests inquiry as a component of prudential standing—inferring limits on who may obtain relief under the law when the statute is silent—is appropriate as part of the cause of action inquiry. [40]

## C. THE FDIC-R'S FAILED THIRD-PARTY STANDING ARGUMENT

The only remaining common component of prudential standing after *Lexmark* is third-party standing. [41] This principle is straightforward: a litigant "generally must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties." [42]

---

[36] *Lexmark*, 134 S. Ct. at 1386

[37] Noting that *Data Processing* focused on interpreting the statutory right of action without expressly characterizing the test as a standing inquiry.

[38] *Richardson*, 426 U.S. at 39 n.19 (recognizing and applying the zone of interests test as a standing test).

[39] *Lexmark*, 134 S. Ct. at 1387

[40] *Ibid.* at 1388–90

[41] *See Chandler & Newville v. Quality Loan Serv. Corp.*, 2014 U.S. Dist. LEXIS 76179, 11–12 (D. Or. Apr. 18, 2014)

[42] *Warth*, 422 U.S. at 499; *see also Kane v. Johns-Manville Corp.*, 843 F.2d 636, 644 (2d Cir. 1988)

The Court has long referred to third-party standing as a prudential limitation rather than a constitutional or statutory one. In *Barrows v. Jackson*,[43] the Court referred to third-party standing as a "complementary rule of self-restraint for its own governance."[44]

Similarly, in *Warth*, the Court characterized the "third-party standing" inquiry as a "rule of self-governance . . . subject to exceptions,"[45] and in *Phillips Petroleum Company v. Shutts*[46] and other cases, the Court referred to it simply as one of the "prudential limits on standing."[47] As Justice Brennan observed, the Court has frequently based its allowance or rejection of third-party standing on the perceived "prudence of exercising jurisdiction rather than the content of substantive federal law."[48]

Nonetheless, in *Lexmark*, the Court suggested that this principle, much like the zone of interests principle, goes to whether the litigant has a cause of action under applicable law.[49]

The *Motion* contends: *"[P]laintiff fails to satisfy the third party standing exception, and Plaintiff lacks prudential standing."* [Mot. at 6.] This assertion is wrong as a matter of law.

With respect to FIRREA's jurisdiction-stripping provision, the Second Circuit "held that, as used in FIRREA's jurisdiction-stripping provision, the word 'claim' is a

---

[43] *Barrows*, 346 U.S. 249

[44] *Ibid.* at 255

[45] *Warth*, 422 U.S. at 509; *see also Raines*, 362 U.S. at 22

[46] *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985)

[47] *Ibid.* at 804; see also *United Food & Commercial Workers Union Local 751 v. Brown Grp.*, 517 U.S. 544, 557–58 (1996); *Franchise Tax Bd. v. Alcan Aluminum*, 493 U.S. 331, 336–37 (1990)

[48] *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 737 n.3 (1990) (Brennan, J., statement).

[49] *Lexmark*, 134 S. Ct. at 1387 n.3

term of-art and must be construed to mean '**only claims** that could be brought under the administrative procedures of § 1821(d), **not any claim** at all involving the FDIC' or, by implication, the failed bank." *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, 902 F. Supp. 2d 476, 501 (S.D.N.Y. 2012); see also *Am. Nat. Ins. Co. v. F.D.I.C.*, 642 F.3d 1137, 1142 (D.C. Cir. 2011) (holding suit against a third-party "for its own wrongdoing, not against the depository institution for which the FDIC is receiver (i.e., Washington Mutual) . . . is not a claim within the meaning of [FIRREA] and thus is not barred") (emphasis added).

Secondly, the FDIC-R persistently contends that the Plaintiff's claims (i.e., direct) against Signature and specific former officers of the bank fall under the jurisdiction of the FDIC-R. [Mot. at pp. 6-7.] This assertion is also wrong as a matter of law.

After exhausting the administrative review process [Mot. at 2.], the Plaintiff has the right to pursue recovery from the defendants, including the executive officer defendants in their individual capacities and DOES 1 through 10, <u>without recourse</u> to the assets of Signature.

The FDIC-R has no authority under FIRREA, Second Circuit case law, or the U.S. Constitution to usurp such claims. FIRREA provides only that, as receiver, the FDIC shall succeed to "all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution *with respect to the institution and the assets of the institution*[.]" 12 U.S.C. § 1821(d)(2)(A)(i).

This section "transfers to the FDIC only stockholders' claims with respect to . . . the assets of the institution—in other words, those that investors . . . would pursue *derivatively* on behalf of the failed bank." *Levin v. Miller*, 763 F.3d 667, 672 (7th Cir. 2014).

Because of this limitation, courts "read § 1821(d)(2)(A)(i) as allocating claims between the FDIC and the failed bank's shareholders rather than transferring to the FDIC **every investor's claims of every description**." [Ibid.]

Courts thus routinely distinguish between derivative claims and direct claims in determining which shareholder claims the FDIC assumes when a bank fails, and hold that the FDIC **assumes only derivative claims** of current shareholders. See, e.g., *Barnes v. Harris*, 783 F.3d 1185, 1193 (10th Cir. 2015) (concluding that, under FIRREA, the FDIC owned shareholders' derivative claims but not shareholders' direct claims); *Lubin v. Skow*, 382 F. App'x 866, 870-71 (11th Cir. 2010) (same); *In re Sunrise Sec. Litig.*, 916 F.2d 874, 889 (3d Cir. 1990) (same).

In this present case, Plaintiff has not asserted derivative claims. [*See generally,* Complaint, [Doc. 1.])

The FDIC-R's actions both before and after Signature's failure should not be ignored. After failing to provide adequate oversight prior to the failure, the FDIC invoked the systemic risk exception of the Federal Deposit Insurance Act to bailout the uninsured, elite customers of the Bank, at the expense of everyday investors like the Plaintiff.

In any event, any reliance by the FDIC-R on § 1821(d)(2)(A)(i) of the FIRREA to seek dismissal of claims against parties other than Signature is entirely misplaced. That section provides that the FDIC succeeds to "all rights" of the failed bank, as well as any "stockholder," but *only* "with respect to the institution and the assets of the institution." *Ibid.*

Indeed, the FDIC has conceded in an action before the Seventh Circuit that this section does not bestow it with claims held by stockholders who "do not depend on an injury to the failed bank." *Levin v. Miller*, 763 F.3d 667, 672 (7th Cir. 2014). As Judge Easterbrook explained there, "[n]o federal court has read the statute" otherwise. *Ibid.*

The case on which the FDIC-R relies, *Zucker v. Rodriguez*, 919 F.3d 649 (1st Cir. 2019), is not to the contrary. That case involved claims by a "sole shareholder" to "recover its interest in a wholly owned subsidiary bank" in FDIC receivership from its "assets." *Ibid.* at 656. That fact pattern bears no resemblance to the facts here. In fact, *Zucker* expressly noted that "this action is **not** one alleging fraud or one to enforce the

securities laws" and stressed that "future claims by . . . other shareholders of banks in FDIC receivership will need to be evaluated on their own terms." *Ibid.* at 646, 660.

Certainly, in *Pareto v. F.D.I.C.*, which the FDIC-R cites, applied this critical distinction between direct and derivative claims, noted that plaintiff "did [not] allege he was fraudulently induced to buy or sell stock" (which is exactly what this action concerns), and held that "[p]laintiff did not have standing to assert [his **derivative** action against the FDIC and the former directors of the bank." 139 F.3d 696, 700-01 (9th Cir. 1998)(emphasis added).

The FDIC-R's *Motion* relies on *Yudell v. Gilbert*, 99 A.D.3d 108, 108 (1st Dep't 2012). [Mot. at 12.] The FDIC-R is mistaken as to whom suffered the harm and who is entitled to recovery.

As the Seventh Circuit in *Levin* observed, "[n]o federal court has read [FIRREA]" to "transfer to the FDIC all claims held by any stockholder of a failed bank." 763 F.3d at 672. Where, as here, a shareholder alleges that defendants made false representations that induced him to pay artificially inflated prices for his stock, [Complaint, Doc. 1 at ¶¶ 40, 55], "[t]here is no compensable injury to the corporation" and, consequently, the claims are direct—not derivative—and the class retains the ability to litigate them, notwithstanding the FDIC receivership. *Howard v. Haddad*, 916 F.2d 167, 169-70 (4th Cir. 1990); see also *Morrone ex rel. Arotech Corp. v. Erlich*, 2011 WL 1322085, at *5 (E.D.N.Y. Mar. 31, 2011) (holding that where misstatements allegedly artificially inflated a company's stock, "any injury due to these omissions accrued to shareholders individually at the time of purchase.").

Further, FDIC-R's *Motion* distorts the allegations presented in the Plaintiff's Complaint: the FDIC-R contends "*Plaintiff's claimed damages against Defendants rely on an alleged reduction in the value of Signature's assets and stock value.*" [Mot. at 5.]

The deliberate reduction of Plaintiff's claims to caricature serves not the pursuit of truth, but rather the indulgence of the FDIC-R's own convenience.

This assertion bears all the hallmarks of sophistry, masquerading as a reasoned legal position. The claim not only fails on its merits but also dares to muddle the legal waters by conflating the allegations against different defendants as if they were all cut from the same unconstitutional cloth.

It is the antithesis of precision to lump all defendants together under a single umbrella of allegations, for not every defendant is a mere clone of the other. Such a blunt approach has no place in jurisprudence, and it reduces the complexity of the case to an unsophisticated simplicity that betrays a fundamental misunderstanding of the law.

Consider, for instance, the allegations brought forth by the Plaintiff [Complaint, Doc. 1., ¶¶ 55-56, 92, 102, 104, 105, 147, 165].

**Not** all the "Plaintiff's claims" against the Defendants pertain to acts that allegedly devalued Signature's assets; some claims focus on the devaluation of these assets, while others address acts that artificially inflated stock prices. The distinction between devaluing assets and inflating stock prices is materially significant and simple to grasp.

To put it bluntly, by way of example, consider an artist who inflates the value of his painting by falsely claiming the use of rare materials and a limited supply (for instance, stating it is 'piece one of one'). A patron of the arts purchases the painting based on this deceitful narrative. Subsequently, the artist intentionally damages the canvas, destroying any value the piece possessed. Thus, the patron suffers harm in two ways (i.e., causation): first, by paying an inflated price due to misrepresentation, and second, by the loss in value of the artwork due to the artist's deliberate act of damage.

<u>Significantly</u>, the FDIC-R does not cite any case where the FDIC has succeeded to shareholders' direct claims under the federal securities laws. This is because <u>courts have consistently held that investors retain the ability to pursue such claims even after a failed bank enters receivership under FIRREA</u>. See, e.g., *Howard*, 916 F.2d at 169-70 (holding that federal securities fraud claims are direct claims not barred by

FIRREA); *Hayes v. Gross*, 982 F.2d 104, 109-10 (3d Cir. 1992) (same); *Abrahamson v. W. Sav. & Loan Ass'n*, 1994 WL 374294, at *7 (D. Ariz. Jan. 24, 1994) (same).

As discussed supra, the authority on which FDIC-R relies does not counsel otherwise. It cites *Zucker v. Rodriguez*, 919 F.3d 649 (1st Cir. 2019), yet *Zucker* is inapposite—it was not a case "alleging fraud or one to enforce the securities laws," but rather claims for negligence and breach of fiduciary duty. [Ibid. at 660] (recognizing policy considerations, including maintaining private parties' incentive to bring securities fraud claims). The district court held those claims belonged to the FDIC but cautioned that its ruling was "a limited one" that "applies only to claims like those before [the court]," "do[es] not establish any broader principles," and that "future claims by holding companies and other shareholders of banks in FDIC receivership will need to be evaluated on their own terms." [Ibid. at 656.]

## III.   DEFICIENCIES IN THE FDIC-R'S ARGUMENT ON THE SUCCESSION CLAUSE

In the FDIC-R's *Motion*, it contends *"Plaintiff would have to show that but-for the alleged malfeasance, "the assets of the Bank would have been much greater, and that increase in Bank assets would have inured to the benefit of" Plaintiff as Signature's stockholder. Zucker*, 919 F.3d at 656." [Mot. at 8.] The FDIC-R is wrong.

### A.   THE TEXT OF THE SUCCESSION CLAUSE DOES NOT SUPPORT THE FDIC-R'S INTERPRETATION

As a threshold matter, the FDIC-R's assertion that it owns investors' direct claims is not supported by the plain language of the statute. [50] The Succession Clause does *not* mention direct claims at all. *See* 12 U.S.C. § 1821(d)(2)(A)(i). It also does not state that the FDIC succeeds to *all* claims a failed bank's shareholder may assert, but rather only those asserting the shareholder's "rights, titles, powers, and privileges . . . *with respect to [the failed bank] and the assets of the [failed bank].*" 12 U.S.C. §

---

[50] "In contested issues of statutory interpretation, the Court begins with the language of the statute itself, examining its 'plain meaning.'" *Ortiz v. Comm'r of Soc. Sec.*, 659 F. Supp. 3d 301, 306 (E.D.N.Y. 2023).

1821(d)(2)(A)(i). Because the statute "transfers to the FDIC *only* stockholders' claims 'with respect to . . . the assets of the institution,'" its scope is limited to "those that investors would pursue *derivatively* on behalf of the failed bank." *Levin v. Miller*, 763 F.3d 667, 672 (7th Cir. 2014).

This language alone should end any dispute because Plaintiff asserts only direct claims for fraud. *See Howard v. Haddad*, 916 F.2d 167, 170 (4th Cir. 1990) (securities fraud claims are direct claims that do not belong to the FDIC); *Patel v. Patel*, 2010 WL 11549879, at *2 (N.D. Ga. Dec. 29, 2010) (same).

Even putting aside the plain language of the Succession Clause, interpreting it to exclude direct securities fraud claims makes complete sense because these claims do not allege harms to "the assets of the *[failed bank]*" under its text. Derivative suits "enforce a *corporate* cause of action." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991). But direct claims do *not* belong to the institution in which investors hold stock—they assert an "individual injury [to investors] distinct from the injury to the corporation," and thus do *not* belong to the institution in which investors hold stock. *In re Smith Barney Transfer Agent Litig.*, 765 F. Supp. 2d 391, 398 (S.D.N.Y. 2011).

Here, Plaintiff does not seek recovery for injuries to Signature or its assets— he alleges that he purchased stock at artificially high prices due to Defendants' fraud— and suffered damage due to the precipitous decline in the price of the personally-held stock when the truth was revealed. [Complaint, Doc. 1, ¶¶ 55-56, 73, 102, 104-105, 147, 165.]

The damages Plaintiff suffered are measured not by a reduction in value of "the assets of Signature, but by "the difference between what he paid and what the stock was [actually] worth on the day he paid it." *See Howard*, 916 F.2d at 169-70.

The value of securities does not directly correlate with the assets of the bank but rather reflects the collective judgment of investors regarding the present and future worth of a security. Said differently, stock prices are determined by the balance of buying and selling in the stock market. When more people want to buy a stock than sell it, the price goes up. If more people want to sell, the price goes down. These decisions

are influenced by investors' expectations of the company's future performance, economic factors, market trends, and **news** (i.e. press releases). Essentially, a stock price reflects what investors are willing to pay for the company's future potential at a given moment. The FDIC-R fails to recognize that the bank's assets are not exclusive in this equation.

Relatedly, under settled law, shares owned by investors are not assets of the bank, but rather are the asset of the investor. *See Eberhard v. Marcu*, 530 F.3d 122, 136 n.14 (2d Cir. 2008) ("[S]hares of stock are . . . *personal* property of the shareholder."). Thus, under the plain text of the Succession Clause, Plaintiff's direct claims are not transferred to the FDIC-R.

Because the Succession Clause did not transfer Plaintiff's claims to the FDIC-R, the FDIC-R's reliance on cases dismissing claims for lack of prudential standing is misplaced. [Mot. at 6-12.] These cases actually *reinforce that the FDIC-R* lacks standing to bring direct claims because the FDIC "cannot rest [its] claim . . . on the legal rights . . . of third parties," (*Rajamin v. Deutsche Bank Nat'l Tr. Co.*, 757 F.3d 79, 86 (2d Cir. 2014)), just as Signature could not bring direct claims for its shareholders' losses (*Smith Barney*, 765 F. Supp. 2d at 398).

Indeed, if the FDIC-R is correct (it is not) that it owns all investors' claims (it does not), then it follows that no class members have standing to pursue any securities fraud claims under the Private Securities Litigation Reform Act of 1995 ("PSLRA").

The PSLRA is a piece of legislation passed by Congress in 1995 to stem the filing of frivolous or unwarranted securities lawsuits. The PSLRA increased the amount of evidence that plaintiffs are required to present before filing a securities fraud case with the federal courts. It also changed the way securities class action lawsuits are handled by giving judges the authority to determine plaintiffs and to take other actions to reduce legal system abuses.

Given the FDIC-R could not bring a securities fraud class action claim, the Succession Clause cannot be interpreted to transfer them. *Levin*, 763 F.3d at 672 ("[FIRREA] is not designed to vaporize claims that otherwise exist after a business

failure. Yet if [the claim] is dismissed . . . no one will be able to pursue it. It would not be sensible to read [the Succession Clause] that way.").

**B.    JUDICIARY HAS NOT AFFIRMED SUCCESSION CLAUSE'S APPLICAPIBILITY TO DIRECT FRAUD CLAIMS**

As these authorities explain, because the Succession Clause only "grants the FDIC-R ownership over all shareholder *derivative* claims against the Bank's officers, . . . if [a plaintiff] can establish a *direct* harm . . . FIRREA would *not* be a bar to standing." *See, e.g.*, *Lubin v. Skow*, 382 Fed. App'x 866, 870-71 (11th Cir. 2010) (per curiam); *see also In re Beach First Nat'l Bancshares, Inc.*, 702 F.3d 772, 780 (4th Cir. 2012) (reversing dismissal of a shareholder's *direct* claim based on the Succession Clause because it "is . . . *not a derivative claim*"); *In re Sunrise Sec. Litig.*, 916 F.2d 874, 889 (3d Cir. 1990) ("To the extent that depositors assert individual, *nonderivative fraud claims* against the officers, directors, auditors, or attorneys of [a failed bank], they may proceed on equal footing with FDIC."). Indeed, "[m]ost courts . . . have held that the [FIRREA] transfers the *derivative* claims of a bank's shareholders to the FDIC, but *not the direct* claims." *Aaron v. Illinois Nat'l Ins. Co.*, 2023 WL 7389034, at *3 (E.D. La. Nov. 8, 2023).

The FDIC-R's selectively chosen and vague quotation, *"Congress has transferred everything it could to the FDIC...",* fails to substantiate the FDIC-R's position in this matter. [Mot. at 2 and 7.] (citing *Pareto v. FDIC*, 139 F.3d 696 (9th Cir. 1998); *Esther Sadowsky Testamentary Tr. v. Syron*, 2009 WL 10697000, at *2-3 (S.D.N.Y. Jan. 28, 2009)). Both cases confirm the distinction between derivative claims (which are transferred to the FDIC) and direct claims (which are not). *See Pareto*, 139 F.3d at 699-700 (applying the Succession Clause because the "claims were for injury to [the bank] itself"); *Syron*, 2009 WL 10697000 at *1 (applying the Succession Clause because "[t]his is a derivative action.").

The FDIC-R asks this Court to cast aside the near-universal case law against it because, the FDIC-R claims, these cases purportedly "fail to analyze the text, structure, history and purpose of FIRREA." [Mot. at 8-9.] The FDIC-R is wrong.

For example, *Levin* closely analyzed the text of the Succession Clause and concluded that, by including the phrase "with respect to . . . the assets of the institution," Congress limited the Succession Clause to derivative claims. *See* 763 F.3d at 672. To the extent *Levin* and other authorities did not further analyze FIRREA's structure, history, and purpose, it is likely because "[n]o federal court has read the statute" to include direct claims, and, in those cases, the FDIC itself actually shared "[the court's] reading of the statute." *Id*.

In *Aaron,* the Court notes other courts applied a direct/derivative test, it nevertheless embraced the test in *Zucker* and found that the claims asserted against the officer defendants belonged to the FDIC-R because the harm was suffered by the failed bank. 2023 WL 7389034, at *4-5 (E.D. La. Nov. 8, 2023). <u>However</u>, the *Aaron* court then abandoned that test and found that the plaintiff owned the claims against an accounting firm because the accounting firm was engaged by the holding company and not the failed bank. *Id*. at *5-6.

## C.   INSURANCE FUNDS ARE NOT AN ASSET OF THE BANK

The FDIC-R seeks priority over private plaintiffs that Congress explicitly rejected in enacting FIRREA. Courts routinely reject this argument based on FIRREA's legislative history. *See, e.g.*, *Howard*, 916 F.2d at 169-70 (holding that the Succession Clause does not apply to claims merely because they "seek to recover from the same assets that the [FDIC] might look to"); *FDIC v. Jenkins*, 888 F.2d 1537, 1546 (11th Cir. 1989) (same). Although the FDIC-R has never stated that it intends to pursue derivative claims against the Individual Defendants or DOES 1 through 10 relating to these facts, it remains free to do so. *See Smith Barney*, 765 F. Supp. 2d at 399 ("[D]irect and derivative actions based on the same underlying conduct" can proceed simultaneously). But "pursuing the same source of assets **does not transform** [the direct] action to a derivative one" within the Succession Clause. *Howard*, 916 F.2d at 170. (emphasis added)

*Zucker* does not support the FDIC-R's argument related to all of Plaintiff's claims. Unlike *Zucker*, where the insurance policy was "an asset shared by the Holding

Company and the Bank" (*Zucker*, 919 F.3d at 657), the FDIC- R's *Motion* did not contend the insurance policies, herein, if any, were an asset of the bank. These authorities confirm that Plaintiff's claims do not "relate to or concern the assets *of the Bank*" under the Succession Clause.

## D.   FIRREA'S   INTENT   AND   HISTORICAL   CONTEXT CONTRADICT THE FDIC'S READING

The FDIC-R's interpretation that FIRREA's legislative purpose and history support its reading of the Succession Clause is incorrect. These hermeneutic tools only serve to emphasize Congress's lack of intention to vest the FDIC with ownership of any direct fraud claims, particularly those against the former directors and officers of a failed institution or its auditors. To the contrary, in enacting FIRREA, Congress recognized that private plaintiffs bringing *securities fraud* lawsuits would play a critical role in achieving FIRREA's goal of preventing a "widespread pattern of fraud and illegal conduct." *See* 135 Cong. Rec. S3993-01, S3994 (April 17, 1989). In fact, Congress expressly rejected a proposal to give the FDIC priority over competing claims asserted by shareholders of the failed bank in suits against officers and directors. *See* S. 774, 101st Cong. § 214(o) (1989). In "overwhelmingly" rejecting this amendment, FIRREA's drafters determined that giving the FDIC such a priority "would represent fundamentally bad policy." 135 Cong. Rec. H4985, at 18339 (daily ed. Aug. 3, 1989) (explaining that giving the FDIC priority would frustrate the purpose of FIRREA because "*private plaintiffs would simply no longer bring fraud suits against bank officers and others guilty of wrongdoing*").

Put simply, Congress' express rejection of a proposal to give the FDIC *priority* over private plaintiffs to pursue direct claims demonstrates that it did not intend for FIRREA to go even further by *stripping* private plaintiffs of their direct claims *and transferring them* to the FDIC—which is exactly the absurd result sought by the FDIC

here. [51] In sum, the FDIC-R's argument stands in stark opposition to the tangible truths of FIRREA's legislative annals—a square peg hammered into a round hole with legislative intent as the mallet.

**E.     REEVALUATING THE FDIC-R'S MISGUIDED DEPENDENCE ON 'ZUCKER' PRECEDENT**

The FDIC-R relies heavily on *Zucker v. Rodriguez*, 919 F.3d 649 (1st Cir. 2019)—but that inapposite ruling, which was expressly limited to its unique facts, does not support the FDIC-R's argument. In *Zucker*, the First Circuit held that the Succession Clause transferred to the FDIC ownership of non-securities fraud claims alleged by the sole shareholder of a failed bank's holding company against the holding company's officers, directors, and insurance company. *Id.* at 650. Unlike here, the claims at issue in *Zucker* were "negligence and breach of fiduciary dut[y]" claims "owed to the Holding Company" that allegedly "caused the Bank's failure and the Holding Company's resultant loss of its investment in the Bank." *Id.* The claim against the bank's insurance company sought coverage under a policy "shared by the Holding Company and the Bank." *Id.* at 657. Under these unique facts, the First Circuit found that the claims fell under the Succession Clause "with respect to the [Bank] and the assets of the [Bank]." *Id.* Critically, however, the court stated its ruling was "a limited one," that it "applies only to claims like those before it," that it "do[es] not establish any broader principles," and that "future claims . . . will need to be evaluated on their own terms." *Id.* at 656.

*Zucker* does not support the FDIC-R's argument here for at least the following reasons.

**First**, critically, *Zucker*'s application of the Succession Clause turned legally and factually on the fact that the claims there "*[were] not one[s] alleging fraud or one[s]*

---

[51] *See also Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) ("[P]rivate actions provide 'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'").

*to enforce the securities laws.*" *Id.* at 660. Here, Plaintiff asserts fraud claims. As such, *Zucker* is inapplicable.

**Second**, *Zucker* erroneously accepted the FDIC-R's flawed interpretation that the Succession Clause transfers shareholder direct claims, which this Court should reject as explained supra. In particular, *Zucker* found FIRREA's legislative history showing that Congress rejected the proposed priority amendment to be irrelevant because that case did not involve securities fraud claims. *Zucker*, 919 F.3d at 660. Here, by contrast, that history is directly on point, which further distinguishes *Zucker* and confirms that Congress did not intend the fraud claims here to fall within the Succession Clause.

**Third**, even under *Zucker*'s flawed analysis, the fraud claims here do not fall within the Succession Clause because they do not "relate to or concern the assets of the Bank." *Id.* at 656-57. As *Aaron* explains, "[w]hile *Zucker* rejects an express distinction between direct and derivative claims, it does not reject a 'source of the harm' inquiry." 2023 WL 7389034, at *4. "The critical inquiry is whether the harm . . . allege[d] is distinct from the harm suffered by the bank." *Id.*

Here, Plaintiff's fraud claims are "distinct from [any] harm *to the bank*" (*Zucker*, 919 F.3d at 653, 656) because they seek to recover (a) on behalf of Plaintiff, not all Signature shareholders, and (b) they are based on the decline in the value of the shares that **Plaintiff purchased**, not a reduction in value of Signature's assets. Stock held by an investor is an asset of that investor, not the bank. *See supra* at Section III.A.

Thus, the damages at issue here are not, as the FDIC-R claims [Mot. at 8.], for *"the assets of the Bank would have been much greater,"* but instead damages inflicted on Plaintiff due to the decline in the value of his personal assets.

Likewise, the misconduct at issue is not that defendants' *mismanagement* caused damage to Signature but, rather, that officers, directors, and auditor of Signature made *misrepresentations* causing damages to *Plaintiff*. *See Howard*, 916 F.2d at 170 (rejecting the FDIC's conflation of securities fraud and corporate mismanagement

claims). With respect to *securities fraud* claims, "[t]here is no compensable injury to the corporation," and thus the FDIC does not own these claims. *Id.*

**Fourth**, *Zucker* does not support that the Succession Clause applies to Plaintiff's claims against "all Defendants" to include DOES 1 through 10. [Mot. at 4.]. *Zucker* did not involve any claim against an auditor; and Plaintiff does not allege that DOES 1 through 10's mismanagement "depressed" Signatures' assets, but rather that "all Defendants" conspired and misled Plaintiff as to the value of his individual shares. [ex. Complaint, Doc. 1, ¶¶ 154, 159].

**Fifth**, the FDIC-R's reliance on *America West Bank Members v. Utah*, 2023 WL 4108352 (D. Utah June 21, 2023) similarly fails. There, the court merely followed *Zucker*'s erroneous interpretation of the Succession Clause, which fails for all of the reasons discussed supra. Moreover, there, the holding company's claims alleged "an injury to the Bank" and sought "recovery of the assets of the Bank," which is not the case here. *Id.* at *7.

## IV.        CONCLUSION

For these reasons, the Plaintiff respectfully requests that the Court deny the FDIC- Receiver's motion to dismiss this case pursuant to Rules 12(b)(6) of the Federal Rules of Civil Procedure, and for such other and further relief as is just and appropriate.

DATED: March 15, 2024

Respectfully submitted,

/s/ Cameron N Verdi /s/

_____

Cameron N. Verdi
Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of March 2024 I caused the foregoing document described as PLAINTIFF CAMERON N. VERDI'S OPPOSITION TO MOTION TO DISMISS to be submitted for electronic filing through the Court's CM/ECF system and accordingly served on all parties' counsel of record having a CM/ECF electronic filing account. The aforementioned document will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Counsel of record are requested to be registered e-filers, and, as such, are automatically e-served with a copy of the documents upon confirmation of filing.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

EXECUTED this 18th day of March 2024, at Newport Beach, California.


*/s/ Cameron N Verdi /s/*


Name: Cameron N Verdi